**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN E. DRAIM,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 01-2690 (JMF)** |
| **VIRTUAL GEOSATELLITE HOLDINGS, INC.,** *et al.,* | |
| **Defendants.** | |
| **MOBILE COMMUNICATIONS HOLDINGS, INC.,** *et al.,* | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 02-0775 (JMF)** |
| **JOHN E. DRAIM,** | |
| **Defendant.** | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER**

These consolidated cases were referred to me, upon consent of the parties, for all purposes including trial.  Prior to the trial, the parties agreed to the dismissal of all claims except plaintiff John Draim's claim that he is entitled to the payment of bonuses for patents issued after he resigned from the corporate defendants' employ and in which he was a named inventor.  A bench trial was held on April 18, 2006 and, after considering the testimony of the witnesses, the exhibits, and the arguments of the parties, I reach the following findings of fact and conclusions

of law.

## FINDINGS OF FACT

1.      In 1992, plaintiff John Draim ("Draim") began working for defendant Mobile
Communications Holdings, Inc. ("MCHI") as a consultant.  Draim and the
president of MCHI, David Castiel ("Castiel") signed a Consulting Agreement
under which Draim agreed to assign to MCHI all rights in his inventions
conceived during the term of the Consulting Agreement and MCHI agreed to pay
Draim a $2,000 bonus upon the filing of a patent application, and a $10,000 bonus
upon the successful issuance of any one patent.  According to the Consulting
Agreement, the actual amount of the bonus would be determined in inverse
proportion to the number of co-inventors listed on the patent application.  Draim
worked for MCHI as a consultant through June 1997.

2.      In July 1997, Draim became an employee of MCHI, but a written employment
agreement was never drafted or signed.  During Draim's employment, the parties
continued to operate under the understanding that Draim's inventions would be
assigned to MCHI, or to other Castiel affiliated entities, and that he would be paid
$2,000 for each patent application and $10,000 for each successful issuance of a
patent.

3.      While employed at MCHI, Draim also performed work for affiliated Castiel
companies (*e.g.*, Defendant Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.)
(collectively the "Castiel entities").

4.      At some point during Draim's employment, the bonus for filing a patent

2

application increased from $2,000 to $2,500, and the bonus for the issuance of a patent increased from $10,000 to $12,500.

5.  In May 2000, Draim terminated his employment and began working for a company named VGS, Inc. ("VGS"), which later became known as Space Resource America Corporation ("SRA").

6.  At the time Draim terminated his employment with the Castiel entities, there were numerous outstanding patent applications in which he was a named inventor. These applications have since resulted in the issuance of eleven patents. The patents name various Castiel entities as the assignees. In some of these patents Draim is listed as the sole inventor, and in some he is listed as one of three or four inventors.

7.  Draim has not been paid a bonus for the issuance of any of these eleven patents.

8.  When the patent office decides that a patent application should be divided into multiple patents, the resulting patents are called "divisional patents." Two of these eleven patents were divisional patents.

9.  In February 2000, three months before Draim resigned, Draim and Castiel filed a provisional patent application for an invention that the parties referred to as the "168 slot" invention. In this provisional application, Castiel and Draim were listed as co-inventors. Provisional applications function as "place holders" and are generally not reviewed by the patent board. The applicant has one year from filing the provisional application to file the actual patent application.

10. In November 2000, SRA filed an "interfering" patent application for the "168

3

slot" invention, naming Draim as the sole inventor.  Subsequently, in February

2001, Castiel filed an application for the "168 slot" invention, but did not name

Draim as an inventor.  Ultimately, the patent was issued to Virtual Geosatellite,

LLC, a Castiel company, as assignee and Draim was not listed as an inventor.

11.     Draim was never paid a bonus for the issuance of the "168 slot" patent.

12.     Around the time of Draim's resignation, several other Castiel employees also left

the Castiel entities to work for VGS.  At trial, defendants presented testimony

about VGS having tried to take over the Castiel entities, steal the Castiel entities'

property, and use the Castiel entities' marketing materials as its own.

## CONCLUSIONS OF LAW

13.     The parties do not dispute that there was a contract between the Castiel entities

and Draim under which Draim was to be paid bonuses for the filing of patent

applications and for the issuance of patents.  Defendants did not argue that, under

the contract, Draim was not entitled the payment of bonuses for patents issued

after the termination of his employment in which he was a named inventor and the

application was filed while he was still employed with the Castiel entities.

Accordingly, I find that there was an enforceable contract and, under that contract,

Draim was entitled to bonuses for the issuance of patents, in which he was a

named inventor, that were based on applications filed during his employment,

regardless of whether the patents were issued after his employment ended.

14.     In defense of the enforcement of this contract, defendants raised three arguments.

First, defendants argued that Draim has already been paid more then he was

4

entitled to receive under the contract.  However, defendants presented no evidence at trial that Draim was paid more than he was entitled to under the employment contract and, therefore, I will not deny enforcement of the contract on that ground.

15.     Second, defendants argued that Draim is not entitled to the payment of bonuses for the issuance of divisional patents.  Two of the twelve patents at issue are divisional patents.  The only written guidance on this issue is the Consulting Agreement, which states that Draim will be paid a bonus "upon successful issuance of any one patent." Plaintiff's Exhibit # 1.  That language indicates that Draim was to paid a bonus upon the issuance of any one patent, regardless of whether or not it was a divisional patent.  In contradiction of this language, defendants argued that it was not Castiel's practice to pay bonuses for divisional patents.  According to Castiel's testimony, he remembers only two prior divisional patents.  No evidence was presented at trial as to whether or not bonuses were paid on these two divisional patents.  Accordingly, I do not find sufficient evidence of a past practice of not paying bonuses for divisional patents and I will not deny enforcement of the contract, in whole or in part, on the ground that two of the patents were divisional patents.

16.     Third, defendants argued that Draim breached a fiduciary duty to the Castiel entities by going to work for VGS and by participating in a conspiracy to take over the Castiel entities and steal their property and that, therefore, Draim is not entitled to the patent bonuses.  I do not find that it is more likely than not that Draim participated in a conspiracy to destroy or steal from the Castile entities.

Defendants presented little to no evidence linking Draim to the alleged VGS conduct, let alone evidence that Draim agreed to take part in an unlawful action. See, e.g., Hall v. Clinton, 285 F.3d 73, 83 (D.C. Cir. 2002) (the two essential elements of civil conspiracy [under District of Columbia law] are (1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner and (2) an overt tortious act in furtherance of the agreement that causes injury).  To the contrary, I find that Castiel's anger at the behavior of his former employees, like Draim, who went to work for VGS, led him not to pay Draim for the bonuses.  Therefore, even if Draim owed a fiduciary duty to the Castiel entities, I find that enforcement of the contract cannot be denied on the ground that Draim breached any such fiduciary duty by participating in a conspiracy.

17.    Accordingly, I find that Draim is entitled to the payment of bonuses based on the $12,500 rate and in an amount in inverse proportion to the number of co-inventors listed on the patent for each of the eleven patents in which he is a named inventor. Specifically, Draim is entitled to the following bonuses:

a.     United States Patent # 6102335; four inventors; bonus = $3,125

b.     United States Patent # 6227497; one inventor; bonus = $12,500

c.     United States Patent # 6263188; three inventors; bonus = $4,166.67

d.     United States Patent # 6457678; one inventor; bonus = $12,500

e.     United States Patent # 6487476; one inventor; bonus = $12,500

f.     United States Patent # 6577864; three inventors; bonus = $4,166.67

g.     United States Patent # 6611683; three inventors; bonus = $4,166.67

  h.  United States Patent # 6678519; three inventors; bonus = $4,166.67

  i.  United States Patent # 6766166; one inventor; bonus = $12,500

  j.  United States Patent # 6795687; three inventors; bonus = $4,166.67

  k.  United States Patent # 6954613; three inventors; bonus = $4,166.67

18.  With regard to the "168 slot" patent, Draim was not named as an inventor in either the patent application or in the resulting patent; Draim was only named as an inventor in the *provisional* application.  Under the Consulting Agreement, Draim was entitled to a bonus upon "the completion of successful filing for any one patent." Plaintiff's Exhibit # 1.  Based on the testimony at trial, I find that it was the parties' understanding that, with regard to the assignment of patent rights and the payment of bonuses, the terms of the Consulting Agreement carried over into Draim's oral employment agreement.  No evidence or argument was presented at trial regarding the expansion of that language to include provisional applications, nor did plaintiff present any evidence that he had been paid bonuses for the filing of provisional applications in the past.  Therefore, I find that Draim is not entitled to a bonus for the issuance of patent number 6695260 (*i.e.*, the "168 slot" patent).

19.  Draim is also entitled to pre-judgment interest on the patent bonuses, to be calculated from the date each patent was issued and at the statutory rate of six-percent per annum. See D.C. Code § 15-108[1]; Bragdon v. Twenty-Five Twelve

---

[1] All citations to the District of Columbia Code are to the electronic versions available through Westlaw and Lexis.

Assocs. Ltd. P'ship, 856 A.2d 1165 (D.C. 2004) (awarding pre-judgment interest

under D.C. Code § 15-508 because it was customary to pay interest on funds that

are withheld and not paid when due and that prejudgment interest is an element of

complete compensation); D.C. Code § 28-3302; District of Columbia v. Pierce

Assocs., Inc., 527 A.2d 306, 311 (D.C. 1987) ("the trial court cannot award

interest at a rate greater than 6% under § 15-508 . . . unless an express contractual

provision is to the contrary.")

## CONCLUSION

Based on the proceeding findings of fact and conclusions of law, plaintiff shall be

awarded $78,125.02 plus prejudgment interest, calculated from the date of the issuance of each

patent through the date of judgment at the rate of six-percent per annum, and costs.  To that end,

the parties are, hereby, **ORDERED** to submit, within ten days of this order, a joint praecipe

detailing the prejudgment interest calculation through the date of the filing of the praecipe.  By

agreeing to the joint praecipe, the parties do not concede any arguments or waive any rights on

appeal.

**SO ORDERED.**

_____
JOHN M. FACCIOLA
Dated:                                             UNITED STATES MAGISTRATE JUDGE