UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN E. DRAIM,

    Plaintiff,

    v.

VIRTUAL GEOSATELLITE HOLDINGS, INC., *et al.*,

    Defendants.

Civil Action No. 01-2690 (JMF)

# FINDINGS OF FACT, SUMMARY CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

## FINDINGS OF FACT

### 1992-1997

1. On November 1, 1992, Draim was hired as a consultant by Mobile Communications Holdings, Incorporated ("MCHI") pursuant to a written consulting agreement dated November 1, 1992. Trial Transcript ("Tr.") at 14.

2. Draim worked for MCHI as a consultant through June 30, 1997. Tr. at 16. He was paid by the hour. Tr. at 15.

3. The consulting agreement provided that Draim would receive $2,000 for each patent application filed and $10,000 for the successful issuance of a patent. Tr. at 16.

4. On July 1, 1997, Draim became a full-time employee of MCHI. Tr. at 17-18.

5. The parties never entered into a written agreement pertaining to Draim's status as an employee. Tr. at 17. They did, however, orally agree that Draim would receive

    a yearly salary of $72,000. Tr. at 17.

6.  In addition, the parties continued to operate under two of the terms of the earlier consulting agreement: that Draim's inventions would be assigned to Virtual Geo and that Draim would be paid $2,000 for each patent application filed and $10,000 for the successful issuance of a patent. Tr. at 17.

7.  At some point after Draim became a full-time employee of MCHI, the bonus for filing a patent application increased from $2,000 to $2,500, and the bonus for issuance of a patent increased from $10,000 to $12,500. Tr. at 93, 94-95.

8.  There was never any discussion between the parties as to whether those obligations imposed on Draim by the written consulting agreement, particularly the obligations imposed by paragraphs 8 and 9, were to continue with the same force and effect once Draim became an employee. Tr. at 32.

### Interfering Application

9.  In February 2000, while still employed by Dr. Castiel's company, Draim and Dr. Castiel jointly filed a provisional patent for the 168 slot application.

10.  Like all the patents Draim worked on while employed by the Castiel companies, the patent application was assigned pursuant to the agreement between Castiel and Draim to Castiel's company, Virtual Geo. Tr. at 38.

11.  After Draim's resignation from Castiel's companies, he went to work for an entity called Satellite Resources of America ("SRA") (formerly VGS). Tr. at 34.

12.  Virtual Geo and SRA were competitors to the extent of developing and using virtual geosynchronous stationary orbital technology. Tr. at 43.

13.  A purported merger between Virtual Geo and VGS was undone by the Delaware Chancery Court. Tr. at 34.

14.  In October 2000, after the merger was undone and Draim was working for SRA, he was directed by a fellow SRA employee to file a patent on the 168 patent for

the purpose of creating an interference with the Virtual Geo patent. Tr. at 39.

15. In a letter to SRA's patent counsel, Draim stated that he had created a portion of the interfering patent application and that "most of the rest of the write-up [was] just extraneous stuff drawn from the prior Virtual Geo patents." Tr. at 40-41.

16. Therefore, in November 2000, Draim processed and filed as sole inventor a patent that he had assigned to SRA that he intended to interfere with the patent that he and Dr. Castiel had co-invented when he was working for Castiel's companies. Tr. at 42.

17. The "extraneous stuff" to which Draim referred in his letter to counsel was drawn from prior Virtual Geo patents that were already in the public domain. Tr. at 50, 58.

18. A patent applicant has one year from the filing of a provisional application to the filing of a final application. Tr. at 59.

19. If two applications are interfering with each other, the United States Patent & Trademark Office must decide who actually owns the technology described in the patent. Tr. at 60.

20. SRA, Draim's new employer, was required to abandon its interfering patent application because of the findings and orders of the Delaware Chancery Court when it undid the purported merger. Tr. at 61.

21. Under that Court's order, Castiel's companies got the 168 slot patent and Castiel removed Draim's name from it. Tr. at 61.

## Computer Theft

22. Draim had no Virtual Geo proprietary information on his computer at home. Tr. at 51-52.

23. A woman named Ms. Lincoln testified in a deposition that she took a laptop, software, giveaways for a conference in Geneva, hard drives, financial files, and

marketing presentations from Virtual Geo and that she took these materials to VGA. Tr. at 100.

24. Ellipso, a Castiel company, bought STK software for $48,000 and loaded it on the stolen computer. Tr. at 101.

25. Draim was aware that a computer that was reportedly taken was subsequently returned to Dr. Castiel. Tr. at 54.

### Assignment of 168 Slot Information to SRA

26. In a marketing document created after Draim had left the employ of Dr. Castiel's companies, SRA claimed that it owned the 168 patent that had been jointly filed by Castiel and Draim in February of 2000. Tr. at 45-46.

27. Draim had no knowledge of the page of the document where that representation was made. Tr. at 46. He inputted material about Cobra technology, invented after he had left Dr. Castiel's employ, into this document. Tr. at 47.

28. In drafting that material, Draim used a published study that had been commissioned and paid for by one of Dr. Castiel's companies. Tr. at 50.

### Failure to Cooperate with Patent Counsel

29. After he left Dr. Castiel's employ, Draim did not cooperate with Dr. Castiel's patent counsel in the prosecution of certain patents in which Draim and Dr. Castiel were inventors. Tr. at 99.

### SUMMARY CONCLUSIONS OF LAW

30. Draim and Dr. Castiel never entered into a written agreement pertaining to Draim's employment after Draim ceased to be a consultant and became an employee.

31. Their minds never met on any of the terms of such an agreement, but they had an oral mutual understanding as to Draim's salary and bonuses.

32. Once the consulting agreement ended, Draim became an employee at will. In

such an employment relationship, neither party is deemed to have entered into a covenant of good faith and fair dealing.

33. As an employee and an agent, Draim nevertheless owed his employer a duty of loyalty.

34. While employed by Dr. Castiel's companies, Draim never engaged in conduct that violated any such duty.

35. Draim and Dr. Castiel never reached an agreement as to any aspect of Draim's behavior after the end of their relationship.

36. Specifically, the parties never agreed that the provisions of the 1992 consulting agreement pertaining to preserving trade secrets and avoiding conflicting activities would continue to operate after Draim left Dr. Castiel's employ.

37. Under District of Columbia law, and in the absence of a contract to the contrary, Draim was free to engage in competing activities once he left Dr. Castiel's employ.

38. District of Columbia law is silent as to whether an employee at will who has resigned is obliged to preserve his former employer's trade secrets inviolate.

39. Assuming he is, there was no evidence whatsoever that Draim breached the confidentiality of any information he learned during his employment in his post-employment activities as an employee of Dr. Castiel's competitor.

40. Draim did not steal a computer from Dr. Castiel's company nor did he ever use any software on such a stolen computer.

41. Draim did not make nor cause to be made any false statement about the ownership of the 168 slot application.

42. Draim used a published study and not a trade secret in the one instance claimed by Dr. Castiel to involve the use of a trade secret.

43. While Draim, having left Dr. Castiel's employ, purposefully filed the interfering

      application described above and failed to cooperate with patent counsel, his actions and dereliction did not violate any contractual duty he had to Dr. Castiel that survived his resignation.

44.    Assuming, however, that they did, there is no evidence that either his conduct as to the interfering application or his failure to cooperate with patent counsel was a material breach of any contractual or agency duty Dr. Castiel could claim.

45.    Draim is entitled to the compensation he claims.

## MEMORANDUM OPINION

This case is before me for all purposes. Currently pending and ready for resolution are the issues set forth in the Court of Appeals' decision of April 8, 2008.

## The Remand

The Court of Appeals has remanded this case to me to consider the claim by Dr. Castiel that Draim breached their employment agreement and therefore is not entitled to the compensation he seeks. <u>Draim v. Virtual Geosatellite Holdings, Inc</u>, 522 F.3d 452 (D.C. Cir. 2008).

## The 1992 Agreement

At trial, Dr. Castiel testified that the 1992 consulting agreement was not one of employment and that the only limitations or restrictions in the consulting agreement were the prohibitions on using "trade secrets[1] and engaging in conflicting activities."[2] These provisions

---

[1] Paragraph 9 of the consulting agreement states:

> Consultant shall treat as proprietary any information belonging to Client, its affiliated companies, or any third parties, disclosed to Consultant in the course of Consultant's services. Consultant assigns and agrees to assign to Client or its nominee all rights in inventions or other proprietary information conceived by Consultant during the term of this Agreement with respect to any work which Consultant performs, and is financially compensated for by Client or the Corporation, under this Agreement. In addition, the Corporation will pay Consultant an amount not to exceed $2,000 as a bonus upon the completion of successful filing for any one patent. The actual amount will be determined in

did not restrict Draim's ability to work for another company after he left defendants' employment. Tr. at 106.

He also conceded that Draim became an employee of his companies in July of 1997 and that there was no written employment agreement pertaining to any aspect of Draim's employment. Id.  According to Dr. Castiel, creating such an agreement "fell between the cracks," although he and Draim may have intended to have such an agreement. Id.  Thus, Dr. Castiel conceded that the 1992 consulting agreement ended when Draim went from being a consultant to being an employee and that a written agreement as to Draim's employment never replaced it. Draim agreed.  See Tr. at 107 (when consulting agreement ended on June 30, 1997 and he became an employee on July 1, 1997, Draim and Dr. Castiel never entered into a written agreement pertaining to his employment from that point on).

In the findings of fact that accompany this opinion, I have therefore concluded that the 1992 written consulting agreement that contained provisions obliging Draim to preserve the

---

> inverse proportion to the number of co-inventors listed in the patent application(s). If Consultant is the sole inventor, the full $2,000 will be paid. Likewise, upon successful issuance of any one patent, the Corporation will pay Consultant an additional bonus not to exceed $10,000, the actual amount of the bonus being determined in inverse proportion to the number of co-inventors listed in the patent(s).

Draim, 522 F.3d at 455 n.4.

[2] Paragraph 8 of the agreement states:

> During the time of this Agreement, Consultant shall not enter into any activity, employment, or business arrangement which conflicts with Client's interest or Consultant's obligations under this Agreement. In view of the sensitive nature of Consultant's status, Client shall have the option of terminating this Agreement at any time if, in its sole judgment, a conflict of interest exists or is imminent.... Consultant shall advise Client of its position with respect to any activity, employment, or business arrangement contemplated by Consultant which may be relevant to this Paragraph. For this purpose Consultant agrees to disclose any such plans to Client prior to implementation.

Id. at 456 n.5.

confidentiality of Dr. Castiel's trade secrets and to refrain from engaging in conflicting activities expired by its own terms on June 30, 1997, and from that point on Draim was an employee. He and Dr. Castiel never executed a written agreement as to that employment.

In my initial opinion I stated: "the parties continued to operate under the understanding articulated in the contract and neither party disputes this finding on appeal." <u>Draim v. Virtual Geosatellite Holdings, Inc.</u>, 433 F. Supp. 2d 99, 101 (D.D.C. 2006). That statement is incorrect insofar as it suggested that the provisions in the 1992 consulting agreement as to protecting trade secrets and refraining from conflicting activities survived the end of the consulting agreement in 1997. I should have said more carefully: "Once the consulting arrangement between Draim and MCHI, generated by the November 1, 1992 agreement, ended with Draim's becoming a full-time employee, there was no written agreement between Draim and his now-employer as to either his compensation or his payment of bonuses. Instead, Draim's employer paid him $72,000 and Draim continued to receive the bonuses that he had received under the consulting agreement, albeit with an increase in the size of the bonuses."

Additionally, there was no testimony that the parties jointly intended to incorporate the provisions of the 1992 consulting agreement, particularly the provisions as to conflicting activities, preservation of trade secrets, and the requirement of giving 30 days notice of a desire to terminate the agreement, into their oral understanding as to Draim's post-1997 employment. Nevertheless, Castiel stated that he believed that the conflict of interest provision that originally appeared in the 1992 consulting agreement was restricted to that agreement itself[3] but that he believed that the trade secrets provision continued even after the termination of the 1992 consulting agreement. As Dr. Castiel put it: "But I guess I understood your question about the term and I understand this [the trade secrets provision] applies beyond the term. It does not mean that if the agreement is terminated he can take our secrets and give them to everybody he

---

[3] Note how the provision pertaining to not entering into conflicting activities is limited to "the time of this Agreement." <u>Draim</u>, 522 F.3d at 456 n.8.

knows." Id.

Thus, as Dr. Castiel saw their relationship following the conclusion of the consulting agreement, he and Draim had an understanding as to Draim's salary and bonuses as well as an understanding that Draim would preserve the trade secrets he learned during his entire relationship with Castiel's companies, including his time as a consultant, as an employee, and then in perpetuity after he left Castiel's employ.

On the other hand, Draim argues that there was no evidence that either party intended that the obligations imposed by the 1992 consulting agreement would pertain to Draim's employment once that agreement expired and he became an employee. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 7-11.

Thus, while the parties had an employment agreement and agreed on compensation in the form of salary and bonuses, they were mutually silent as to any other terms. The court must therefore look to the law of the District of Columbia to ascertain the nature of the employment contract and whether certain terms (if any) will be imputed to the parties or implied to fulfill the employment agreement the parties agreed to, including the obligation not to divulge trade secrets.

**The Law of the District of Columbia**

Under the law of the District of Columbia, the mutual promise to employ and serve creates a contract terminable at the will of either party. Unless the parties agree to enter into a contract for a fixed duration or a written contract for permanent employment, the employment will be regarded as terminable at will. Sullivan v. Heritage Found., 399 A.2d 856, 860 (D.C. 1979) applied as the law of the District of Columbia in Shankle v. DRG Fin. Corp., 729 F. Supp. 122, 124 (D.D.C. 1989). Accord Willoughby v. Potomac Elec. Power Co., 100 F.3d 999, 1001 (D.C. Cir. 1996) (applying DC law, employment relationship is presumed to be terminable at will by either employer or employee), cert denied, 520 U.S. 1199 (1997); Turner v. Fed Ex, 539 F. Supp. 2d 404, 410 (D.D.C. 2008) (applying DC law, "[t]he presumption of at-will

9

employment is rebutted only where the parties clearly state an intention to place limits on the employer's right to terminate"); Daisley v. Riggs Bank, 372 F. Supp. 2d 61, 67-68 (applying DC law, presumption in favor of an at-will employment is overcome only by clear expression of an intention to limit employer's right to terminate).  See Wright v. District of Columbia Dept. of Employment Services, 560 A.2d 509, 512 (D.C. App 1989).[4]

Under District of Columbia law, every contract is deemed to contain an implied covenant of good faith and fair dealing that means that neither party shall do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000).  Unfortunately for Dr. Castiel, any claim by him that Draim had obligations that flowed to him from this implied covenant founders on the equally well-settled principle that a claim for a breach of this duty cannot be made by the parties to an employment contract that is terminable at will. Id. at 310 n.28 ("[S]uch a claim [for breach of covenant of good faith and fair dealing] cannot be made by an at-will employee because there is no contract to provide a basis for the covenant."). Accord Clampitt v, Am. Univ., 957 A.2d 23, 39 (D.C. 2008); Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 627 (D.C. 1997); Brug v. Nat'l Coal. for the Homeless, 45 F. Supp. 2d 33, 43 (D.D.C. 1999).  Thus, Dr. Castiel cannot proceed against Draim on the basis that any of his conduct, regardless of its nature, breached this covenant.

Dr. Castiel could, however, proceed upon the theory that even in the absence of a written contract and even in an employment agreement that is at will, an employee must, as a matter of agency law, act solely for the benefit of her principal in all matters concerning her agency. Gross v. Akin, Gump, Strauss, Hauer & Feld, 599 F. Supp. 2d 23, 32 (D.D.C. 2009) (relying on RESTATEMENT (SECOND) OF THE LAW OF AGENCY § 387). But, Dr. Castiel conceded that the

---

[4] Note that Draim could not possibly have breached his employment agreement by leaving Dr. Castiel's employ whether or not he gave the 30 days notice that he would have had to give under the 1992 consulting agreement before he left because under District of Columbia law, either party could terminate the employment relationship at will.

obligation of the 1992 agreement not to engage in conflicting activities did not survive the term of that agreement.  This would mean that (1) during the term of the consulting agreement, 1992-1997, Draim owed Dr. Castiel the contractual duties defined in paragraphs 8 and 9 of the consulting agreement; (2) during the 1997-2000 period, Draim owed Dr. Castiel the fiduciary duty to act solely in Dr. Castiel's benefit in all matters concerning his employment by Dr. Castiel; and (3) Draim owed Dr. Castiel neither a contractual nor an agency, fiduciary duty upon the termination of his employment.

Moreover, conceded or not, an employee, upon termination of her employment, may compete against her former employer. RESTATEMENT (SECOND) OF THE LAW OF AGENCY § 396(a) (1958) ("Unless otherwise agreed, after the termination of the agency, the agent: (a) has no duty not to compete with the principal").[5]  This is the law of the District of Columbia. United States Travel Agency, Inc. v. World-Wide Travel Service Corp., 235 A.2d 788, 789 (D.C. 1967) ("An agent after termination of his employment, in the abscence of an agreement to the contrary, may compete with his former principal . . ."). Accord Group Assoc. Plans, Inc v. Colquhoun, 466 F.2d 469, 474 (D.C. Cir. 1972) (acknowledging "common law doctrine that permits an employee to compete with his former employer absent an express contractual provision to the contrary.") See Mercer Mgmt. Consulting Inc. v. Wilde, 920 F. Supp. 219, 233 (D.D.C. 1996) (even while employed, an employee may make arrangements to compete with his principal provided no unfair acts are committed or injury done his principal); Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1265 (D.D.C. 1977) (same).  Draim's post-termination activities therefore cannot serve as the basis for any claim of breach of an agent's fiduciary duty to his principal because Draim went to work for a competitor and in fact competed against Dr. Castiel.

While the same section of the RESTATEMENT imposes on Draim a post-termination

---

[5] In the RESTATEMENT (THIRD) OF THE LAW OF AGENCY (2006), this principle appears as Comment C to § 8.04.

obligation to maintain the confidentiality of the trade secrets he learned while employed, RESTATEMENT (SECOND) OF THE LAW OF AGENCY § 396(b) (1958), I have found no evidence whatsoever that, either while employed or thereafter, Draim converted to his own use or to the use of any of Dr. Castiel's competitors trade secret information. I therefore have specifically found as a fact that he did not breach in that manner any fiduciary obligation he may have had in this respect.

While it does not deal with secrecy, I must say that I am much more concerned about Draim's admitted failure, after he left Dr. Castiel's employ, to cooperate with patent counsel in perfecting the patents he had worked on and his purposefully filing an interfering application. It is in my view not worthy of a man who is obviously honorable. Nevertheless, there is no authority I can find that would impose upon Draim a duty, expressed in the law of the agency or a contractual duty that survived the termination of his at-will employment, that would have obliged him to cooperate with Dr. Castiel and not to compete against him. As to the latter and as I have just pointed out, Draim could legitimately compete against Dr. Castiel once their relationship ended if one views the matter from the perspective of the law of agency. As to the law of contracts, District of Columbia law does not derive a covenant of good faith and fair dealing from an at-will employment and, even if it did, that duty ended when he left Dr. Castiel's companies.

Furthermore, any contractual breach must be material as the court of appeals defined that term in this case:

> If Draim engaged in conduct that constituted a material breach of his employment contract, then he is not entitled to payment of bonuses under the contract. "A total breach may be ... by such a material failure of performance when due as to go to the essence and frustrate substantially the purpose for which the contract was agreed to by the injured party." Keefe Co. v. Americable Int'l, Inc., 755 A.2d 469, 475 (D.C. 2000) (quoting San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl.Ct. 276, 280 (1991)) (internal quotation marks omitted); see also 23 WILLISTON ON CONTRACTS § 63.3 (4th ed.).

Draim, 522 F.3d at 454-55.

The only assertion of materiality as to Draim's conduct is that his doing so caused "confusion in the marketplace of the ownership of the patents." <u>Defendants' Proposed Findings of Fact and Conclusions of Law</u> at 8.  There was, however, no evidence whatsoever at trial of any such confusion.  In fact, the statements in the trial transcript cited in support of this assertion (Tr. at 118) deal only with the dates of certain patent applications.  At no point did defendants offer any evidence that Draim's not cooperating with patent counsel and filing the interfering application caused them any practical harm.  There was no evidence of lost sales, no evidence that potential buyers of the technologies at issue were confused to defendants' actual detriment, and no evidence of money or time that defendants had to spend to undo the harm that Draim's activities might have caused their competitive position.  Indeed, as to the interfering application, Dr. Castiel eventually secured the 168 patent and Draim's name was stricken from it.

 In the absence of any such evidence, I cannot possibly conclude that there was a material breach of any contractual obligation Draim had, even if I were to assume that Draim had such obligations.  By the same token, I cannot find that any breach of any duty Draim owed Dr. Castiel as his former agent (assuming a former agent has any such duty) caused Dr. Castiel such substantial harm that I should in justice and fairness deny Draim the compensation he is otherwise due.

Finally, I appreciate that Dr. Castiel also accused Draim of (1) being involved in the theft of a computer and the proprietary software on it; (2) stating in a marketing document that his new employer owned the 168 slot application patent when Draim knew the new employer did not and using a study that had been commissioned and paid for by Dr. Castiel; and (3) engaging in a conspiracy to destroy the entities owned by Dr. Castiel.  I have found, however, that Draim was not involved in the theft of the computer and did not use the proprietary software on it.  I also credit Draim's testimony that he was not aware of the statement about the 168 slot application in the marketing document and that his sole contribution to that document was to input the description of the Cobra technology that was not owned by Dr. Castiel.  Finally, the

Court of Appeals' remand and my second review of the trial transcript and the exhibits offered into evidence gives me no reason to revisit my earlier finding "that I do not find that it is more likely than not that Draim participated in a conspiracy to destroy or steal from the Castiel entities." <u>Findings of Fact, Conclusions of Law and Order</u> ¶ 16.

_____/S/_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated: July 1, 2009